997 F.2d 958
 302 U.S.App.D.C. 268, 62 USLW 2051
 INDEPENDENT INSURANCE AGENTS OF AMERICA, INC. et al., Appellants,
v.
Eugene LUDWIG, Comptroller of the Currency.
NATIONAL ASSOCIATION OF LIFE UNDERWRITERS, et al., Appellants,
v.
Eugene LUDWIG, et al.
 Nos. 90-5209, 90-5214.
 United States Court of Appeals,
 District of Columbia Circuit.
July 16, 1993.
 
 Anthony G. Steinmeyer, Theodore C. Hirt, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant.
 Jonathan B. Sallet, Ann M. Kappler, Genner & Block, Washington, DC, for appellants.
 Before SILBERMAN, BUCKLEY, and HENDERSON, Circuit Judges.
 BUCKLEY, Circuit Judge:
 
 
 1
 This case is before us on remand from the Supreme Court. It concerns the interpretation of section 92 of the National Bank Act, which authorizes any bank located in a community with a population of 5,000 or less to sell insurance, subject to the regulations of the Comptroller of the Currency. The Comptroller determined that section 92 imposes no geographic limit on the insurance market so that, as long as it is located in a small town, a bank is free to solicit and serve insurance customers everywhere. We uphold the Comptroller's interpretation as permissible.
 
 I. BACKGROUND
 
 2
 Enacted in 1916, section 92 of the National Bank Act ("NBA") provides in relevant part that
 
 
 3
 any [national banking] association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as agent for any ... insurance [302 U.S.App.D.C. 269] company authorized by the authorities of the State in which said bank is located to do business in said state....
 
 
 4
 12 U.S.C.S. § 92 (1978). In 1963, the Comptroller ruled that section 92 permits the branch of a national bank located in a community with a population of 5,000 or under ("small town") to sell insurance even though its principal office is located in a larger community. This policy is codified at 12 C.F.R. § 7.7100 (1993).
 
 
 5
 The present controversy has its genesis in an opinion issued in 1983 by Debra A. Chong, an attorney in the Comptroller's San Francisco office. In response to a letter from a Commerce Department official, she asserted that a small-town bank could sell insurance "without geographic restriction to the community [in which] it is located," though whether sales could be made across state lines was "an unsettled issue." Joint Appendix ("J.A.") 61. In 1984, the United States National Bank of Oregon ("the Bank"), a subsidiary of U.S. Bancorp, proposed to sell insurance from its branch in Banks, Oregon, population 489, "to customers of U.S. Bank and others." J.A. 63. The Bank said that its proposal relied on section 92 and the Chong letter. In reply, the Comptroller told the Bank not to proceed until "this Office communicates in writing that it has no objection." J.A. 64; see 12 C.F.R. § 5.34(d)(1). The Comptroller then undertook a review of the policy set forth in the Chong letter.
 
 
 6
 In 1986, the agency endorsed the Chong position and approved the Bank's proposal. A letter from Judith A. Walter, the Senior Deputy Comptroller for National Operations, explained:
 
 
 7
 Based on our analysis of the relevant legal precedent, we have concluded that Ms. Chong correctly determined that a national bank or its branch which is located in a place of 5,000 or under population may sell insurance to existing and potential customers located anywhere. In other words, while the bank or bank branch must be located in a small town, it can sell insurance to persons and businesses located outside that town.
 
 
 8
 J.A. 65. As bases for this conclusion, the official discussed the statute, its legislative history, principles of statutory construction, and the regulation allowing branch banks to sell insurance from small towns.
 
 
 9
 Trade associations representing insurance agents and underwriters filed suit, arguing that the Comptroller had exceeded his statutory authority. The district court (Pratt, J.) granted the defendants' motion for summary judgment. National Ass'n of Life Underwriters v. Clarke, 736 F.Supp. 1162 (D.D.C.1990). We reversed on the ground that Congress had repealed section 92 in 1918; hence, there was no legal authority to support the Comptroller's ruling. See Independent Ins. Agents of Am., Inc. v. Clarke, 955 F.2d 731, 739 (D.C.Cir.1992). On June 7, 1993, however, the Supreme Court found that section 92 had not been repealed and remanded the case to us. See United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., --- U.S. ----, ----, 113 S.Ct. 2173, 2186-87, 124 L.Ed.2d 402 (1993).
 
 II. DISCUSSION
 
 10
 Appellants challenge the Comptroller's action as contrary to congressional intent, contrary to the Comptroller's prior interpretations of section 92, and contrary to the parallel provisions of the Bank Holding Company Act. We discuss these arguments in turn.
 
 A. Interpretation of Section 92
 
 11
 The precise question before us is whether section 92 places any limitations on the geographical scope of the insurance business that may be conducted by a national bank located in a community having a population of 5,000 or under. It is not relevant, for this purpose, that the bank in question is a subsidiary of a major banking corporation.
 
 
 12
 In examining the Comptroller's interpretation of the National Bank Act, we apply the principles set forth in Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). We start by searching for an "unambiguously expressed intent of Congress," id. at 843, 104 S.Ct. at 2781, that addresses the "precise question at issue," id. at 843 n. 9, 104 S.Ct. at 2781 n. 9. If we find such an intent, "that is the end of the matter"; we must enforce it. Id. at 842, [302 U.S.App.D.C. 270] 104 S.Ct. at 2781. If we do not, we must defer to the agency's interpretation so long as it is permissible. Id. at 843, 104 S.Ct. at 2781; see also K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988) (court must defer if agency construction "not in conflict with the plain language of the statute"). Appellants argue that Congress specifically intended to restrict the insurance sales geographically. In the alternative, they submit that although Congress had no specific intent on the matter, the Comptroller's interpretation is unreasonable.
 
 
 13
 In our quest for congressional intent, we begin, as always, with the words of the statute. See Mead Corp. v. Tilley, 490 U.S. 714, 722, 109 S.Ct. 2156, 2161, 104 L.Ed.2d 796 (1989). Section 92 provides that a national bank located and doing business in a community having a population of not more than 5,000 may "act as the agent for any ... insurance company ... by soliciting and selling insurance and collecting premiums." 12 U.S.C.S. § 92. These words evince no unambiguous command that the banks may sell insurance only to local townspeople.
 
 
 14
 The statutory structure is even less helpful to appellants. As originally enacted, section 92 also permitted banks in small towns to "act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located." 12 U.S.C.S. § 92 (1978) (emphasis added). As Judge Pratt noted, this provision indicates that "Congress knew how to impose geographic restrictions when it wanted to." 736 F.Supp. at 1168; see INS v. Cardoza-Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987). Congress subsequently repealed the loan-brokering provision, see Pub.L. No. 97-320, § 403(b), 96 Stat. 1511 (1982), but that repeal did not purport to affect the provisions at issue here; they continue to be governed by the 1916 congressional intent.
 
 
 15
 As the words and structure do not reflect an unambiguous intent on the issue, we may consult legislative history. See Burlington N. R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987) (stating that "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity"). The only "history" appellants are able to offer is a letter from the then-Comptroller, J. Skelton Williams, to the Chairman of the Senate Banking and Currency Committee, which the Chairman entered in the Congressional Record. 53 Cong.Rec. S11,001 (1916), cited in Saxon v. Georgia Ass'n of Indep. Ins. Agents, 399 F.2d 1010, 1015-16 (5th Cir.1968).
 
 
 16
 In that letter, Mr. Williams observed that many banks in small towns had failed and others had been "tempted to exact excessive and in some cases grossly usurious rates." 53 Cong.Rec. at S11,001. To give the struggling banks "additional sources of revenue and [to] place them in a position where they could better compete with local State banks and trust companies," he recommended allowing national banks in towns with a population of 3,000 or under to sell insurance and to broker real estate loans. Id. He stressed that the new powers should be limited to small-town banks, which would be unlikely to "trespass upon outside business naturally belonging to others." Id. He added:
 
 
 17
 I think it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and expert bankers. I think it would be unfortunate if any movement should be made in the direction of placing the banks of the country in the category of department stores. The business is one requiring training, skill, and application, and I think that the profession of banking would suffer if there should be a departure from the principles which should govern and have heretofore governed.
 
 
 18
 Id. As enacted, the amendments used a population cut-off of 5,000 rather than 3,000.
 
 
 19
 We agree with appellants that U.S. Bancorp, with its more than $7 billion in assets, is not the sort of struggling "country bank" whose plight troubled Mr. Williams. He and any members of Congress who were influenced by his letter might well have been dismayed if they had foreseen a multi-billion-dollar holding company selling insurance nationwide [302 U.S.App.D.C. 271] through the small-town branch of a subsidiary bank. But we cannot assume that Mr. Williams' letter was read, much less relied upon, by the majorities in Congress who enacted section 92. Cf. Murphy v. Empire of Am., FSA, 746 F.2d 931, 935 (2d Cir.1984) (isolated remarks on floor of Congress "are entitled to little or no weight"). Thus, we accord it only limited deference.
 
 
 20
 In sum, we find nothing in this history to suggest an unambiguous congressional intent on the precise question at issue. Furthermore, it is not our job to divine how legislators would have responded to hypotheticals, see American Bankers Ass'n v. SEC, 804 F.2d 739, 749 (D.C.Cir.1986)--particularly where the question is as unknowable as the reaction of 1916 legislators to a world of microchips, communication satellites, fax machines, direct mail and telephone solicitation, and all the other technologies and techniques that now enable a nationwide business to be conducted from any hamlet. We decline appellants' invitation to recast the statute to fit contemporary circumstances; when time and technology open up a loophole, it is up to Congress to decide whether it should be plugged, and how.
 
 
 21
 As we have found no specific congressional intent to restrict the geographical reach of the insurance sales authorized by section 92, we turn to the second prong of Chevron: whether the challenged interpretation represented "a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2782. In appellants' view, the Comptroller's action fails this lenient test by "interpret[ing] the limited exception contained in Section 92 so broadly as to destroy the National Bank Act's overarching policy against permitting national banks to engage in the sale of insurance and other commercial activities not incidental to the business of banking." Reply Brief at 2.
 
 
 22
 We see no need, however, to canvass the landscape of banking regulation. The Fifty-third Congress expressly permitted small town banks to sell insurance, and the Comptroller has concluded that it did not impose a geographic limit on the insurance business they are allowed to conduct. To overturn the Comptroller's construction, we would have to conclude that it is "so inconsistent" with a "sufficiently clear" statutory policy as to demonstrate that "Congress' clear intent has been violated." Investment Co. Inst. v. Conover, 790 F.2d 925, 935 (D.C.Cir.1986) (internal quotation marks and citation omitted). We find no basis for doing so. And, to the extent that subsequent developments have threatened to cause the section 92 exception to swallow any rules, the "solution," if there is to be one, lies with Congress, not the courts.
 
 
 23
 If, as appellants claim, there has indeed been a departure from the "overarching policy" of the NBA, it had its genesis decades before the Comptroller approved the Bank's proposal. In 1963, the Comptroller permitted small-town branch banks to sell insurance. See 36 Fed.Reg. 17,000, at 17,015 (1971) (publishing 1963 ruling). No longer did section 92 aid only the "small national banks" about which Mr. Williams had written, 53 Cong.Rec. at S11,001; now, heavily capitalized corporations with faraway headquarters could share its benefits, including those deriving from technological innovations undreamed of in the early years of this century. This appears to be the crucial step away from the constraints on the activities of major banks that Congress may well have intended. Judge Pratt, however, ruled that laches prevented appellants from challenging the 1963 regulation, see 736 F.Supp. at 1165 n. 11, and they do not appeal that ruling.
 
 
 24
 Finally, appellants note that the Comptroller's Chief Counsel asserted in a 1987 speech that "the business of banking is the business of providing financial services--and insurance is one of them." J.A. 162. Appellants maintain that this speech exposes the Comptroller's order here as "an effort to subvert the core policies sub silentio in pursuit of a covert deregulatory agenda." Brief for Appellants at 31. The district court, however, refused to consider the speech as a supplemental exhibit, and termed it "a post hoc commentary" of no relevance. 736 F.Supp. at 1163 n. 4. In our view, the speech is hardly a smoking gun, and the evidentiary ruling was well within the court's capacious discretion. See United States v. Dakins, 872 F.2d 1061, 1063 (D.C.Cir.1989).[302 U.S.App.D.C. 272] B. Deviation from Prior Policy
 
 
 25
 "Divergence from agency precedent demands an explanation." Hall v. McLaughlin, 864 F.2d 868, 872 (D.C.Cir.1989). As evidence of inconsistent prior policies, appellants proffer six unpublished letters from the Comptroller's office that are dated between 1963 and 1986. They were released to appellants under the Freedom of Information Act, with the recipients' names and addresses blacked out.
 
 
 26
 We need not determine whether these letters conflict with the Comptroller's current interpretation because, like "[m]ost decisions in most federal agencies," they "have no effect as precedents." 4 K. Davis, Administrative Law Treatise § 20:9, at 31 (2d ed. 1983). In "the real world of agency practice," informal unpublished letters "should not engender reliance." Malkan FM Assocs. v. FCC, 935 F.2d 1313, 1319 (D.C.Cir.1991); cf. USAA Fed. Savings Bank v. McLaughlin, 849 F.2d 1505, 1509 (D.C.Cir.1988) (finding agency action not yet final based partly upon "the informality of the communication (an unpublished letter to a particular individual responding to a specific inquiry)"); New York Stock Exch., Inc. v. Bloom, 562 F.2d 736, 741 (D.C.Cir.1977) (finding informal advisory letter from Comptroller's office not ripe for review). The Comptroller may well have assumed that section 92 imposed some geographic limit, but, as he never set forth that assumption in a binding statement, his current interpretation of section 92 does not deviate from prior policy.
 
 C. Bank Holding Company Act
 
 27
 Appellants base two arguments on the 1982 amendment to the Bank Holding Company Act ("BHCA"), which permits any subsidiary of a bank holding company to sell insurance in a place with a population of 5,000 or under. See 12 U.S.C. § 1843(c)(8)(C). Congress evidently intended that the provision parallel section 92, see S.Rep. No. 536, 97th Cong.2d Sess. 38 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3092, and the Federal Reserve Board has interpreted it as limiting the insurance activities to areas with fewer than 5,000 people and "other areas of less than 5,000 adjacent" to them, 51 Fed.Reg. 30,201, at 36,206 (1986).
 
 
 28
 Appellants assert that the 1982 BHCA amendment, as interpreted by the Federal Reserve Board, illuminates the intent of the 1916 Congress. The problems with this argument are multiple. As Judge Pratt noted, "[t]he two provisions were enacted over sixty-five years apart and deal with two different types of banking institutions, each subject to a distinct set of laws and regulations administered by separate agencies." 736 F.Supp. at 1171. Moreover, an act of Congress in 1982 can shed no light on the intent of Congress in 1916. See Russello v. United States, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983).
 
 
 29
 Appellants also contend that the Comptroller should have considered the BHCA amendment in determining whether the Bank's proposal was consistent with section 92 because the BHCA applies to the holding company of which the Bank is a subsidiary. This argument founders on American Ins. Ass'n v. Clarke, 865 F.2d 278 (D.C.Cir.1988). There we initially addressed the Comptroller's interpretations of both the NBA and the BHCA. Id. at 284-86. On rehearing, however, we "conclude[d] that it was inappropriate for us to have reached the [BHCA] question," id. at 287, because the Comptroller derived his authority solely under the NBA, and it was his responsibility to determine issues under that Act, not under the BHCA. In light of the Comptroller's lack of authority over and under the BHCA, and the statute's tangential relationship to this case, we conclude that he was not obligated to consider the 1982 amendment.
 
 III. CONCLUSION
 
 30
 As we find that the order is a permissible interpretation of section 92 and does not diverge from binding agency precedents, the district court's ruling is
 
 
 31
 Affirmed.